**Jennie ROMERO, Petitioner,**

v.

**The INDUSTRIAL CLAIM APPEALS OFFICE OF the STATE OF COLORADO; Miller Stockman; and the Colorado Compensation Insurance Authority, Respondents.**

**No. 93CE0018.**

Colorado Court of Appeals,
Div. I.

Feb. 23, 1995.

Rehearing Denied March 23, 1995.

Certiorari Granted Aug. 28, 1995.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Pepe J. Mendez & Associates, P.C., Pepe J. Mendez, Denver, for petitioner.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John D. Baird, First Asst. Atty. Gen., Denver, for respondent Indus. Claim Appeals Office.

Colorado Compensation Ins. Authority, Michael J. Steiner, Vaughan, Reeves & De-Muro, David R. DeMuro, Denver, for respondents Miller Stockman and Colorado Compensation Ins. Authority.

Opinion by Judge CRISWELL.

This appeal by claimant, Jennie Romero, from an order of the Industrial Claim Appeals Office (Panel) denying her permanent total disability benefits for an injury arising out of and in the course of her employment with Miller Stockman, requires us to consider the constitutional validity of § 8–42–111(5), C.R.S. (1994 Cum.Supp.), which disqualifies an employee aged 65 or older from receiving any compensation for permanent total disability. Because we conclude that this statutory provision offends against the equal protection requirements of the Fourteenth Amendment and Colo. Const. art. II, § 25, we set aside the Panel's order and remand the cause to it for its further consideration.

The facts upon which claimant grounds her claim for benefits are undisputed and were the subject of a stipulation by the parties. That stipulation establishes that claimant suffered an industrial injury on April 8, 1992, on which date she was 64 years of age. As a result of that injury, claimant is now permanently and totally disabled within the meaning of the Workers' Compensation Act (the Act), *i.e.*, she is "unable to earn any wages" from her former or other employment. *See* § 8–40–201(16.5)(a), C.R.S. (1994 Cum. Supp.); *McKinney v. Industrial Claim Appeals Office*, 894 P.2d 42 (Colo.App.1995).

Some four months prior to her injury, claimant had begun to receive old-age retirement benefits under the federal old-age, survivors, and disability insurance program of the Social Security Act. However, the amount of such monthly old-age retirement benefits was only $471, and because those benefits were claimant's only source of funds (other than wages), she had continued to work for Miller Stockman after she began to receive such benefits. But for her serious industrial injury, she would have continued to work. As a result of this injury, however, she is unable to earn any wages from any source.

If an employee, such as claimant, suffers permanent total disability as a result of an industrial injury, that employee is normally entitled to receive a "disability indemnity ... payable as wages," *see* § 8–42–103(1), C.R.S. (1994 Cum.Supp.), equal to 66⅔% of that employee's average weekly wage, subject to a specified maximum weekly amount. Section 8–42–111(1), C.R.S. (1994 Cum.Supp.).

In 1991, however, the Colorado General Assembly adopted Colo.Sess.Laws 1991, ch. 219, § 8–42–111(5) at 1313, which provided that:

> For injuries occurring on and after July 1, 1991, compensation payable [as permanent total disability benefits] shall cease when the employee reaches the age of sixty-five years.

In 1994, this statute was amended to make its provisions applicable only to injuries occurring "on and after July 1, 1991, and before July 1, 1994." Colo.Sess.Laws 1994, ch. 322, § 8–42–111(5) at 2002–2003. And, the Panel's denial of permanent total disability benefits to claimant here was grounded solely upon the provisions of this statute.

Claimant argues that, because the sole criterion for denial of benefits under § 8–42–111(5) is the age of the employee, an arbitrary classification of workers is created, rendering the statute violative of the equal protection guarantees of the Fourteenth Amendment and Colo. Const. art. II, § 25. She also asserts that, to the extent that this statute may be designed to effect an offset against workers' compensation disability benefits of any social security old-age retirement benefits, the operation of the statute is pre-empted by the Social Security Act. Because we agree that this statute violates claimant's right to equal protection, we do not address her claim of pre-emption.

I. *Standard of review.*

The standard pursuant to which a statute is to be tested for equal protection purposes varies depending upon the nature of the classification created. If the classification is one involving a "suspect class," such as one based on race or national origin, or if it has an impact upon a fundamental right, the state has the burden of demonstrating that the statute is necessarily related to a compelling governmental interest and that the classification is specially fashioned and narrowly tailored to further its legitimate objective. *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16, 40 (1973) (a "suspect class" is one that is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.").

If, on the other hand, no suspect class or fundamental right is implicated, it is generally true that the party challenging the statute must demonstrate that the classification does not have a factual basis or that it is not related to a legitimate state purpose. *San Antonio Independent School District v. Rodriguez, supra; Higgs v. Western Landscaping & Sprinkler Systems, Inc.,* 804 P.2d 161 (Colo.1991); *Naiden v. Epps,* 867 P.2d 215 (Colo.App.1993). There is an "intermediate" standard of review which has also been used, under which the state has the burden of proving that the statutory classification serves an important government objective and that it is substantially related to the achievement of that objective. However, this third standard has so far been applied only to classifications based upon gender, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), alienage, *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), or illegitimacy, *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977).

Claimant argues, however, that this intermediate standard of review should be used to test the statute's validity here. We disagree.

The United States Supreme Court has not applied this intermediate standard to an age-based claim. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (state does not violate Fourteenth Amendment by requiring state police to retire at age 50). *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Murgia* with approval in concluding that persons who are mentally retarded are not such a class as to mandate the application of the intermediate standard).

We are bound by the *Murgia* determination of the standard of review for Fourteenth Amendment purposes. Hence, the fact that the statutory classification here is based upon age does not require the use of the intermediate standard.

Likewise, we reject claimant's argument that, because § 8–42–111(5) was allegedly adopted as a part of "reform" legislation in reaction to an "insurance crisis," the intermediate standard of review must be employed. *See Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980) (because right to recover for personal injuries is an important right, intermediate standard will be used in reviewing "tort reform" legislation).

Our supreme court has applied the rational relationship standard of review to legislation limiting recovery for personal injuries, *Lee v. Colorado Department of Health,* 718 P.2d 221 (Colo.1986), and it has specifically rejected the argument that an intermediate standard of review should be applied to such statutes. *State v. DeFoor,* 824 P.2d 783 (Colo.1992); *Dove v. Delgado,* 808 P.2d 1270 (Colo.1991). In our view, the considerations applicable in these types of actions are equally applicable here. *See Duran v. Industrial Claim Appeals Office,* 883 P.2d 477 (Colo. 1994) (applying rational relationship standard to claim that provision of Act violates equal protection).

We conclude, therefore, that for Fourteenth Amendment purposes we must apply the rational relationship standard to the statute here in question. And, we shall apply the same standard for testing its validity under the state constitution. *See Central*

*Colorado Water Conservancy District v. Simpson,* 877 P.2d 335 (Colo.1994) (standards of review under 14th Amendment are generally applicable to review under Colo. Const. art. II, § 25.)

Hence, in order to determine that § 8–42–111(5) violates claimant's rights to equal protection, we must be convinced beyond a reasonable doubt either that the statute is not designed to achieve a legitimate state purpose or that the classifications created by it are not rationally related to the achievement of that purpose.

## II. *Effect of challenged statute on the Act as a whole.*

While the Act has undergone substantive amendments in recent years, the essential principles of its application have remained constant since its adoption in 1919. If an employee suffers an injury arising out of and in the course of employment, that employee will be deemed to have waived all common law and statutory claims against the employer, except for claims for compensation provided for by the Act. *See* §§ 8–41–102 and 8–41–103, C.R.S. (1994 Cum.Supp.).

In return for this waiver, the employee is entitled to receive from the employer, without consideration of fault for the injury, several specified benefits. *Frohlick Crane Service, Inc. v. Mack,* 182 Colo. 34, 510 P.2d 891 (1973). If a physical impairment results from the injury, one of the benefits to be provided is a "disability indemnity," § 8–42–103, C.R.S. (1994 Cum.Supp.), both on a temporary basis, §§ 8–42–105 and 8–42–106, C.R.S. (1994 Cum.Supp.), and for an extended period if the impairment is permanent. Sections 8–42–107 and 8–42–111, C.R.S. (1994 Cum.Supp.).

The indemnity payable for permanent impairments differs, depending upon whether the employee is only partially impaired or is totally disabled. *See* §§ 8–42–107 and 8–42–111. If the injury results in only a partial impairment, the weekly benefits will be paid for a maximum of 400 weeks. If the disability is total, there is no maximum number of weeks for which the indemnity will be paid, and prior to 1991, benefits continued until the death of the employee. Sections 8–42–107(8) and 8–42–111, C.R.S. (1994 Cum. Supp.). In either case, however, if, as here, the disability results from a "non-scheduled" injury, the amount of the weekly indemnity payable to the employee will be the same; it is the period over which such indemnity is payable that will differ. *See* §§ 8–42–107(8)(d) and 8–42–111(1), C.R.S. (1994 Cum. Supp.).

The Act provides that any indemnity payable for any permanent disability, whether partial or total, is to be reduced by an amount equal to one-half of any "periodic *disability* benefits" payable to the employee under either the Social Security Act or any private pension plan. Sections 8–42–103(1)(c)(I) and 8–42–103(1)(d)(I), C.R.S. (1994 Cum.Supp.) (emphasis supplied). Further, in 1990—one year prior to the adoption of § 8–42–111(5)—the Act was amended so as to provide that, if *"retirement* benefits," either under the federal act or under a private pension program, are payable when the individual reaches the age of sixty-five years, an amount equal to one-half of the social security retirement benefits, or an amount attributable to the employer's contributions to a private plan, are also to be deducted from any permanent *total* disability benefits. Colo.Sess.Laws 1990, ch. 62, § 8–42–103(1)(c)(II)(A) and (B) at 488 (emphasis supplied).

Subsection 8–42–111(5) was initially adopted in 1991. Colo.Sess.Laws 1991, ch. 219 at 1313. As is clear from the face of its provisions, it applies only to those claimants who are 65 years of age or older and only to those whose injuries have rendered them permanently and totally disabled, *i.e.,* those who are unable to earn any wages from any source.

Thus, if a claimant is capable of earning at least *some* wages, he or she will not be considered to be totally disabled, and that claimant will, therefore, continue to be eligible to receive compensation benefits, based upon a partial disability, irrespective of that claimant's age. It is only those older workers whose physical disability makes it impossible for them to provide for themselves by

continuing to work who are denied compensation benefits by § 8–42–111(5).

In addition, whether the claimant is eligible to receive disability or retirement benefits from some other public or private source is irrelevant to the disqualification imposed by § 8–42–111(5). Under the amended Act, any claimant who is under 65 or who, although 65 or over, is only partially impaired, will receive compensation benefits for his or her impairment, even though that claimant is also receiving retirement benefits from some source, subject only to a reduction in benefits based upon the amount of any disability benefits received from another source. *See* § 8–42–103(1)(c) and (d). However, if the employee is 65 or over *and* is totally disabled, no compensation benefits will be paid, even though that employee is not eligible to receive any other disability or retirement benefits.

### III. *Purpose of § 8–42–111(5) and Its Legitimacy.*

◼◼◼ The Panel has filed no separate brief with this court, but has simply joined with the other respondents in their assertions. Consequently, we have not been provided with the Attorney General's particular views as to the alleged legitimate purpose that § 8–42–111(5) is designed to achieve. The other respondents, while disclaiming any obligation to supply any explanation of the statute's underlying purpose, have argued that its evident intent is to prevent a "duplication of benefits." They reason that, because it may be assumed that persons aged 65 or older are eligible for social security or other retirement programs, the denial of workers' compensation benefits to such individuals will prevent them from receiving benefits under both programs and that this was the consideration which spurred the adoption of § 8–42–111(5).

At best, the legislative history of the statute supports this conclusion only in part. Section 8–42–111(5) was enacted as a part of S.B. 91–218, Colo.Sess.Laws 1991, ch. 219 at 1291 to 1342, which made several substantive changes to the workers' compensation benefits program. The overall purpose of this legislation was to attempt to reduce the cost

to the employers of providing such benefits. *See McKinney v. Industrial Claim Appeals Office, supra.*

Section 8–42–111(5) was not a part of the original S.B. 91–218, nor was it added by either the Senate or the House during their initial consideration of the legislation. It was only after both bodies had passed different versions of the original measure, causing a reference to a conference committee, that an age limitation upon benefits became a subject for consideration.

The taped record of the Conference Committee meeting reflects that § 8–42–111(5) was adopted, not to prevent receipt of duplicate benefits, as such, but because the committee members felt that enacting an age "cap" would aid in reducing benefit costs and that, commencing at age 65, it should be "government's responsibility," through "social programs," to care for injured workers. There was little discussion respecting the reason why § 8–42–111(5) was limited only to those workers sustaining a total disability. It was noted, however, that the Act provided lifetime benefits for those determined to be totally disabled, while a limitation of 400 weeks of benefits applied to those suffering only a partial impairment. *See* Conference Committee Meeting on S.B. 91–218, 58th General Assembly, First Regular Session (May 5, 1991).

Some further light is shed upon the purpose of § 8–42–111(5) by a review of the legislative history of its later amendment.

In 1994, S.B. 94–199, Colo.Sess.Laws 1994, ch. 322 at 2000 to 2004, was adopted. This bill caused both the age cap in § 8–42–111(5) and the cost of living (COLA) increases for permanent total disability benefits contained in § 8–42–111(1), C.R.S. (1994 Cum.Supp.), which had also been adopted in 1991, to apply only to injuries occurring between July 1, 1991, and July 1, 1994. The taped record of a Senate State Affairs Committee hearing on that bill reflects that the legislators concluded that the age cap in § 8–42–111(5) was originally adopted as a means of paying for the COLA increases; the age cap had been a "trade-off" for the COLA. However, later, the age cap's "fairness" had been questioned,

and because S.B. 94–199 was designed to terminate the COLA increases, equity dictated that the age cap should be restricted in its operation to the period during which the COLA had been effective. Hearing on S.B. 94–199 before Senate State Affairs Committee, 59th General Assembly, First Regular Session (April 11, 1994).

This legislative history, therefore, evidences that § 8–42–111(5) is simply a measure adopted to reduce costs, not one intended to prevent duplicative payments.

Further, § 8–42–103(1)(c) and (d) had already *directly* addressed the issue of duplication of benefits, by requiring a part of all disability and retirement benefits received from other sources to be deducted from the amount of any permanent total disability benefits to be received. Accordingly, if the prevention of duplication of benefits was the statute's purpose, it is inexplicable why the General Assembly chose to enact an *age* disqualification statute, rather than simply increasing the percentage of these other benefits which was to be deducted. Indeed, since at least 50% of the amount of these other benefits are to be deducted from any permanent total disability benefits in any case, the only persons affected by § 8–42–111(5) are those employees over 65, such as claimant here, whose benefits from these other sources are insufficient to result in a total depletion under § 8–42–103(1)(c) and (d) of the workers' permanent total disability benefits.

Finally, the ends sought to be achieved by public and private retirement programs, on the one hand, and the public goals inherent in the Act, on the other, are substantially different. A retirement program is normally based upon the length of the employee's past service and upon his or her past wage level; as compensation for *past* service, the retirement benefits enable the employee voluntarily to cease work. Compensation under the Act, on the other hand, is not based upon the length of the employee's past service nor upon any wage history. Such compensation, rather, is designed to replace the employee's *future* wages, see § 8–42–103(1), when that employee is involuntarily required to cease work because of some employment-caused

injury. *See State Compensation Insurance Authority v. Industrial Claim Appeals Office,* 786 P.2d 423 (Colo.App.1989) (because permanent disability benefits are to compensate for loss of *capacity* to work, retirement does not prohibit receipt of such benefits).

For this reason, at least one court has determined that a statutory provision requiring workers' compensation to be reduced because of the receipt of *retirement* benefits does not rationally serve the purpose of preventing a duplication of benefits. *Sasso v. Ram Property Management,* 431 So.2d 204 (Fla.App.1983); *contra Harris v. State,* 120 Wash.2d 461, 843 P.2d 1056 (1993). Claimant has not, however, challenged the validity of either § 8–42–103(1)(c) or § 8–42–111(5) on this basis.

Given the foregoing considerations, therefore, we entertain serious reservations whether § 8–42–111(5) was adopted for the purpose of preventing the duplication of benefits, which is the only legitimate purpose that has been suggested for it. Nevertheless, in considering the statute's rationality, we shall assume, arguendo, that this is its purpose and that such a purpose is a legitimate one. *See Kinterknecht v. Industrial Commission,* 175 Colo. 60, 485 P.2d 721 (1971) (if any conceivable set of facts would lead to conclusion that classification serves legitimate purpose, courts must assume those facts exist).

### IV. *Rational Relationship between Classifications Created and Statute's Purpose.*

Assuming, then, that the purpose of § 8–42–111(5) is the prevention of receipt of duplicative benefits, we must determine whether the classifications created by this statute have a reasonable basis in fact and whether they bear a rational relationship to this legislative purpose. *Western Metal Lath v. Acoustical & Construction Supply, Inc.,* 851 P.2d 875 (Colo.1993).

Viewed within the context of permanent disability benefit recipients, § 8–42–111(5) creates three classes: (1) those employees who have sustained either a partial or a total disability, but who are *under* 65 years of age;

(2) those who have sustained only a *partial* impairment and are 65 or older; and (3) those who are *totally* disabled and who are 65 or older. Thus, while the age of the recipient is a substantial distinguishing factor among these three classes, the statute also distinguishes between older employees themselves, based upon the degree of disability suffered.

We recognize that both age differences and differences based upon degrees of disability have factual underpinnings. *See Duran v. Industrial Claim Appeals Office, supra.* We conclude, however, that the classifications here have no reasonable relationship to the purpose the statute is allegedly aimed at achieving, *i.e.,* to prevent receipt of duplicative benefits.

We may properly note that age 65 is the normal retirement age, both under the Social Security Act and under various private pension plans, although it is also common for such plans to allow an earlier retirement. *See, e.g.,* 42 U.S.C. § 402(a) (1988) (authorizing retirement at age 62 under the Social Security Act). And, it is this fact upon which respondents rest their claimed justification for the distinctions drawn by § 8–42–111(5).

However, the classifications created by this statute do not rest upon a simple age distinction. Rather, under § 8–42–111(5) compensation benefits are denied only to those aged 65 or more who are totally disabled.

Respondents have argued that most persons 65 or older are eligible to receive retirement benefits and that those who are not so eligible constitute isolated exceptions, the existence of which do not invalidate the statute's overall classifications. In support of this argument, they point to the principle stated in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), that a legislative line need not be drawn with mathematical nicety, so that the existence of some inequality in some instances will not invalidate a statute.

But, granting that respondents' assumption, that persons 65 or older are eligible for retirement benefits, is a valid one, it provides no proper explanation of the purpose for the distinction made between those who are totally disabled and those who are only partially impaired. If we assume that most persons in *both* groups are eligible to receive retirement benefits and that the statute's purpose is to prevent the receipt of both these benefits and "duplicating" compensation benefits under the Act, there is no logical reason that has been suggested why persons with only partial disabilities should continue to receive such duplicating benefits while persons who are totally disabled are prevented from doing so.

On the contrary, the distinction between partially disabled workers and those who are totally disabled has no relevance to the amount of *retirement* benefits which they may be entitled to receive. Whether an employee suffers a total disability or only a partial impairment as a result of an industrial injury depends upon the circumstances surrounding the injury. The degree of disability suffered does not depend, in any way, upon the amount of retirement benefits which that employee may be eligible to receive.

Nevertheless, the statute under consideration allows workers 65 or older, who have suffered a partial disability, to continue to receive compensation benefits, even though they may also be receiving full retirement benefits, while it denies compensation benefits to workers of the same age who are totally disabled and are eligible only for minimal or no retirement benefits. If the prevention of duplicative benefits for those 65 or older is the statute's goal, the distinction made by it between partially disabled workers and totally disabled workers has no relationship to that goal.

For some purposes, of course, the distinction between partially disabled workers and totally disabled workers provides a rational basis for different treatment. *See Duran v. Industrial Claim Appeals Office, supra.* Here, however, if one considers the alleged purpose of the legislation, the class of workers disqualified from receiving benefits has the same essential characteristic as does the class which is not disqualified, *i.e.,* eligibility for retirement benefits. *See City of Cleburne v. Cleburne Living Center, Inc., supra* (in view of alleged purpose of zoning ordinance to reduce traffic and congestion, there is no rational distinction between home for mentally retarded persons and other multiperson residential uses).

We conclude, therefore, that, if the purpose of § 8–42–111(5) is to prevent the receipt of duplicating benefits, the classifications created by it are not rationally related to that purpose.

In this respect, the statute's distinction between persons totally disabled and those only partially impaired distinguishes it from similar statutes adopted by other states which have received judicial approval. While these other statutes incorporate an age cap, they apply to *all* permanent disabilities, both partial and total. In addition, these other statutes do not make the disqualification dependent solely upon the claimant's age; the disqualified claimant must be receiving, or be eligible to receive, retirement benefits. *See Sasso v. Ram Property Management, supra; Brown v. Goodyear Tire & Rubber Co.,* 3 Kan.App.2d 648, 599 P.2d 1031 (1979). *See also Cruz v. Chevrolet Grey Iron,* 398 Mich. 117, 247 N.W.2d 764 (1976) (statute applied to all permanent disabilities and reduced benefits 5% per annum, commencing at age 65 and continuing to 75, but provided for payment of minimum level of benefits in all cases). *Cf.* § 8–42–107(8)(e), C.R.S. (1994 Cum.Supp.), which incorporates an age factor into determination of amount of permanent partial impairment benefits.

Further, even if we were to consider that the legislative purpose of § 8–42–111(5) was not to avoid duplication of benefits, but that it was designed to reduce benefit costs, we would nevertheless conclude that the classifications created have no rational relationship to that purpose.

We accept the proposition that cost reduction is a legitimate state purpose. *See Duran v. Industrial Claim Appeals Office, supra.* Such a purpose, however, cannot be achieved by arbitrarily denying benefits to one class of workers that are provided to others. *See Higgs v. Western Landscaping & Sprinkler Systems, Inc., supra* (establishing special definition of wages under Act so as to reduce benefit costs for agricultural industry workers only violates equal protection); *Petrafeck v. Industrial Commission,* 191 Colo. 566, 554 P.2d 1097 (1976) (excluding tips from concept of wages also violative of equal protection).

Here, the cost reduction program, if such it be, is required to be funded solely by persons aged 65 or older who are totally disabled. The limitation upon benefits is not based upon a total amount received nor even upon the period over which they are to be received. Hence, a worker totally disabled at age 25 will receive 40 years of benefits. Likewise, a worker who is only partially disabled at age 65 or older may receive up to 400 weeks of benefits. Claimant here, however, although both totally disabled and over 65, receives nothing in the form of permanent disability benefits. This "cost sharing" inequality results in constitutional inequality.

We are also influenced in both these conclusions by the public policy that inheres within the Age Discrimination in Employment Act (ADEA). The ADEA is intended "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b) (1988). It is applicable both to private and to public employers, including the state. 29 U.S.C. § 630(b) (1988); *Equal Employment Opportunity Commission v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983).

Among ADEA's substantive provisions is one that prohibits an employer from discriminating against any employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1988).

Under that provision, it is improper for either a private employer or the state itself (with respect to its employees) to compel its older employees to substitute retirement benefits for disability benefits. Disability benefits for older workers can be reduced only to reflect any increased costs of providing such benefits; they cannot be denied. *See* 29 U.S.C. § 623(a)(1) (1988); 29 C.F.R. § 1625.10 (1994); *Betts v. Hamilton County Board,* 897 F.2d 1380 (6th Cir.1990), *cert. denied,* 498 U.S. 963, 111 S.Ct. 397, 112 L.Ed.2d 407 (1990); *Smith v. Alum Rock Union Elementary School District,* 6 Cal. App.4th 1651, 8 Cal.Rptr.2d 399 (1992); *Equal Employment Opportunity Commission v. Maryland National Capital Park & Planning Commission,* 673 F.Supp. 746 (D.Md.1987).

In addition, a private employer cannot rely upon the provisions of a state law to justify its violation of the ADEA. *Equal Employment Opportunity Commission v. County of Allegheny*, 705 F.2d 679 (3d Cir.1983).

Hence, if disability benefits under the Act were to be considered "compensation, terms, conditions, or privileges of employment" under 29 U.S.C. § 623(a)(1), the respondents here could not refuse to make such disability payments to claimant because of the existence of § 8–42–111(5). Likewise, the state itself could not deprive its older workers of such compensation benefits.

We do not determine that the disability payments at issue are governed by the ADEA. Nevertheless, we consider it proper to consider the important public policy that inheres in the ADEA in assessing the rationality or the arbitrariness of the classifications created by § 8–42–111(5). And, that public policy supports our conclusion that § 8–42–111(5) is constitutionally arbitrary.

The order of the Panel is set aside, and the cause is remanded to it for further proceedings consistent with the views contained in this opinion. .

METZGER and KAPELKE, JJ., concur.